

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

LINTON JOSEPH HIGGENBOTHAM                    CIVIL ACTION

VERSUS                                        NO. 04-2033

BURL CAIN                                     SECTION "R"(5)

### REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. §636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. §2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE**.

## I.  PROCEDURAL HISTORY

Petitioner, Linton Joseph Higgenbotham,[1] is a state

---

[1]In several of petitioner's state court pleadings, his last name is spelled "Higginbotham", rather than "Higgenbotham".  Because "Higgenbotham" is the spelling employed by petitioner in his federal habeas corpus application, this is the spelling the court



prisoner currently incarcerated in the Louisiana State Penitentiary, Angola, Louisiana. Petitioner was charged by grand jury indictment with aggravated rape and aggravated kidnapping. Petitioner, on June 30, 1999, was found guilty, following trial by jury, of simple rape and simple kidnapping.[2] On August 16, 1999, the trial court, finding petitioner to be "a habitual offender convicted thrice previously of felonies",[3] sentenced petitioner, in connection with his simple rape conviction, to life imprisonment without benefit of parole, probation or suspension of sentence.[4] In connection with his simple kidnapping conviction, the court sentenced petitioner to 12 years imprisonment without benefit of parole, probation or suspension of sentence.[5]

Petitioner appealed both his simple rape and simple kidnapping convictions. On November 3, 2000, the Louisiana First Circuit affirmed petitioner's convictions, but vacated his 12-year sentence, remanding the matter "to the trial court for resentencing on the simple kidnapping conviction pursuant to La. R.S. 14:45B." State v. Higginbotham, Number 99 KA 2960 (La. App. 1 Cir. 2000)

---

will utilize in the instant Report and Recommendation.

[2] See State rec., vol. 3 of 5, p. 338.

[3] See State rec., vol. 1 of 5, p. 29, lines 25-27.

[4] See State rec., vol. 1 of 5, p. 31, lines 16-21.

[5] See State rec., vol. 1 of 5, p. 31, lines 26-30.

(unpublished decision).[6]  On that same date, the Louisiana First Circuit Court of Appeal affirmed petitioner's habitual offender adjudication and the life sentence imposed in connection with his simple rape conviction.  State v. Higginbotham, Number 99 KA 2961 (La. App. 1 Cir. 2000) (unpublished opinion).[7]  Approximately one year later, on November 16, 2001, the Louisiana Supreme Court denied petitioner relief with respect to both his simple rape and simple kidnapping convictions, as well as his habitual offender adjudication.  State v. Higginbotham, 802 So.2d 621 (La. 2001).

On March 6, 2002, the state trial court resentenced petitioner, in connection with his simple kidnapping conviction, to five years incarceration, specifying that his five-year sentence "is to be consecutive to" the life sentence imposed in connection with petitioner's simple rape conviction.[8]

---

[6]One complete copy of the First Circuit's unpublished decision is contained in the State rec., vol. 4 of 5, pp. 823-811.  On this copy, the opinion is designated as "Number 99 KA 2960", though unlike the rest of the designation, the "99" appears to have been handwritten rather than typed.  Another copy of the opinion, which is incomplete as it is missing the first page, is contained in the State rec., vol. 4 of 5, pp. 1167-1156.  This copy, however, is designated as "Number 00 KA 2960".  Upon inquiry to the Clerk's Office for the Louisiana First Circuit Court of Appeal, the court was advised that the correct designation is "Number 99 KA 2960".  The pages upon which the opinion is contained are in inverse order because all of the pages comprising vol. 4 of the State rec. are Bates-stamped in inverse order.

[7]A copy of the First Circuit's unpublished opinion is contained in the State rec., vol. 1 of 5, pp. 90-95.

[8]See State rec., vol. 4 of 5, p. 916.

On or about June 26, 2002, petitioner filed an application for post-conviction relief with the state trial court.[9] Setting forth reasons in support of its decision, the trial court denied petitioner relief on August 21, 2002.[10] On December 3, 2002, the Louisiana First Circuit Court of Appeal likewise denied petitioner post-conviction relief,[11] then, on June 2, 2003, denied petitioner's request for rehearing.[12] Finally, on June 18, 2004, petitioner's state post-conviction proceedings came to an end when the Louisiana Supreme Court denied his writ application. State ex rel. Higginbotham v. State, 876 So.2d 797 (La. 2004).

In the instant federal habeas corpus action, petitioner raises the following claims: 1) He was denied a fair and impartial trial due to the fact that the State allowed the victim to present perjured testimony; 2) Due to the lack of physical evidence, insufficient showing was made that a rape occurred; 3) He was denied effective assistance of counsel due to counsel's failure to impeach the victim; 4) Insufficient evidence of simple rape; court should not have instructed jury with regard to simple rape; 5) Insufficient evidence of simple kidnapping; and, 6) Life sentence was unconstitutionally excessive. In its response, the State

---

[9]See State rec., vol. 4 of 5, pp. 990-984.

[10]See State rec., vol. 4 of 5, pp. 1093-1086.

[11]See State rec., vol. 4 of 5, p. 1100.

[12]See State rec., vol. 4 of 5, p. 1114.

concedes that the instant action is timely and that petitioner, as required under Rose v. Lundy, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982), has exhausted his state court remedies.[13]  Before proceeding to the merits, the court shall review the applicable facts.[14]

On the evening of October 2, 1997, the victim went to a bar in Houma, Louisiana, to apply for a job as a bartender.  On that same night, she had a few alcoholic drinks with two friends who met her at the bar.  After several hours, the group went to another bar, Kathy Shaw's, where the victim had more drinks. Before leaving, both of the victim's companions separately offered her a ride home, which she declined, saying she would call a taxi to get home.  The victim called for a taxi about 1:30 a.m., after all the other customers had left Kathy Shaw's.  While waiting, she helped the bartender, Vicki Doss, stock the bar with beer.  When they heard a car pull up outside, Doss and the victim went to the door.  Doss asked the driver if he was there for the victim. Receiving an affirmative response, the victim got into the car, which was occupied by defendant and his accomplice, Timothy Argo.

When the victim gave defendant her address, he replied that he had to take the other passenger home first.  The victim

---

[13]See Federal rec., doc. #4, p. 8.

[14]The facts are taken from the Louisiana First Circuit Court of Appeal's opinion, State v. Higginbotham, Number 99 KA 2960 (La. App. 1 Cir. 2000) (unpublished decision).

became nervous when the car pulled up to a house and defendant and Argo got out and walked to the front of the house.  After she rolled the window down and said she needed to go home, defendant and Argo dragged her from the car and into one of the bedrooms of the house.

After both men removed her clothes, Argo held the victim down while defendant had vaginal sexual intercourse with her.  The men then switched positions, and Argo had vaginal sexual intercourse with the victim.  Defendant and Argo each raped the victim several times.  The victim told the men they had no right to touch her.  Throughout the ordeal, the victim was crying, shaking, and pleading with the men not to kill her.  The men told her to shut up, threatening to hurt her if she screamed or tried to get away.  The victim finally was allowed to dress, and then was taken several blocks away by car and released.  She proceeded to a nearby apartment where she was allowed to use the telephone to summon help.  The victim later identified defendant and Argo in photographic lineups as the men who raped her.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") includes a comprehensive overhaul of federal habeas corpus legislation, including 28 U.S.C. §2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and

law where there has been an adjudication on the merits in state
court proceedings.

State court determinations of questions of law and mixed
questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1)
and receive deference unless they were "contrary to, or involved an
unreasonable application of clearly established Federal law, as
determined by the Supreme Court of the United States."   Hill v.
Johnson, 210 F.3d 481, 485 (5th Cir. 2000).   The United States
Supreme Court has advised that:

> Under the "contrary to" clause, a federal habeas corpus
> court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case
> differently than this Court has on a set of materially
> indistinguishable facts.   Under the "unreasonable
> application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing
> legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the
> prisoner's case.

Williams v. Taylor, 529 U.S. 1056, 120 S.Ct. 1495, 1523, 146
L.Ed.2d 389 (2000); Hill, 210 F.3d at 485.  Questions of fact found
by the state court are "presumed to be correct ... and we will give
deference to the state court's decision unless it `was based on an
unreasonable determination of the facts in light of the evidence
presented in the State court proceeding.'" Hill, 210 F.3d at 485,
quoting 28 U.S.C.§2254(d)(2).

### III. ANALYSIS

### A.  State Allowed Victim to Present Perjured Testimony

Petitioner claims that he was denied a fair and impartial trial due to the State allowing the victim to present perjured testimony.  Such a claim is considered to be a mixed question of law and fact.  Fairman v. Anderson, 188 F.3d 635, 640 (5th Cir. 1999).

In Napue v. Illinois, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178-79, 3 L.Ed.2d 1217 (1959), the Supreme Court held that a prosecutor's knowing use of, or deliberate failure to correct, perjured testimony, violates a defendant's Fourteenth Amendment rights.  In order to show a Napue violation, a petitioner must establish the following three elements: "[F]irst, that false testimony was presented ...; second, that the prosecution had actual knowledge that the testimony was false; and third, that the testimony was material."  Clements v. Cain, 1998 WL 382146, *4 (E.D. La. 1998), citing Carter v. Johnson, 131 F. 3d 452 (5th Cir. 1997), cert. denied, 523 U.S. 1099, 118 S.Ct. 1567, 140 L.Ed.2d 801 (1998), citing May v. Collins, 955 F.2d 299, 315 (5th Cir.), cert. denied, 504 U.S. 901, 112 S.Ct. 1925, 118 L.Ed.2d 533 (1992); see also United States v. Haese, 162 F.3d 359, 365 (5th Cir. 1998), cert. denied, 526 U.S. 1138, 119 S.Ct. 1795, 143 L.Ed.2d 1022 (1999).

In support of his claim, petitioner notes the following inconsistencies in the victim's version of events, as well as in the trial testimony of one of the State's witnesses, Vicki Lynn

8

Doss Fusco ("Vicki").

1) The victim claimed that she was grabbed or dragged from petitioner's car into the house where she was raped, but the physician who examined her shortly after the incident found no cuts, bruises or abrasions on the victim's body;

2) The victim initially stated that she called for a cab, then later stated that the bartender, Vicki, called for the cab;

3) The victim initially stated that she walked into the bar's parking lot and saw two men in a car.  Later, the victim stated that the two men came inside the bar.  In a third version, the victim stated that she and the bartender walked outside and saw two men drive into the parking lot;

4) Vicki informed police that she did not see the two men who drove away with the victim, but, at trial, stated that she was the one who asked them if they were there to bring the victim home;

5) The victim claimed to have been looking for a job on the night in question, yet she was severely intoxicated; and,

6) The victim informed police that the car that picked her up was a "large, light colored vehicle".  At trial, the victim described the car as "light grey or light blue."  Vicki, the bartender, described the car as "light brown;[15]

For the following reasons, the above-described inconsistencies are insufficient to satisfy petitioner's burden of proof.  First, several of them, such as the color of the assailants' car and precisely where she was located when she first

---

[15]See Federal rec., doc. #1, petitioner's memorandum in support of writ of habeas corpus at pp. 6-10.  Petitioner attributes the above-described inconsistencies to the victim's inebriation at the time of the crime and at the time she reported the matter to police.

encountered her assailants, are insignificant, attributable to simple error rather than any intent to deceive. Second, inconsistencies are not, per se, sufficient for purposes of satisfying petitioner's burden of proof. In Haese, 162 F.3d at 365, the court found that the fact that two witnesses testified inconsistently did not demonstrate that one of them lied. See also United States of America v. Clagett, 1999 WL 754406, *1 (9th Cir. 1999) (The fact that "the officer's testimony was inconsistent with earlier statements does not establish that his testimony at trial was false; neither does it conclusively prove that the prosecutor knew the testimony was false.") A conflict in testimony is generally a matter to be considered by the jury in determining a witness's credibility and the weight to be accorded to his or her testimony. Haese, 162 F.3d at 365; United States v. Miranne, 688 F.2d 980, 989 (5th Cir. 1982), cert. denied, 459 U.S. 1109, 103 S.Ct. 736, 74 L.Ed.2d 959 (1983). Third, as the state trial court noted in rejecting the instant claim, petitioner "has not presented to the court any specific information which suggests the prosecution knowingly allowed witnesses at his trial to commit perjury. [Petitioner] only suggests that because a great deal of the testimony presented at his trial was contradictory, the trial was not fair and impartial."[16] Accordingly, the court finds that the state court's rejection of the instant claim does not

---

[16]See State rec., vol. 4 of 5, p. 1149.

constitute an unreasonable application of the law enunciated by the Supreme Court in <u>Napue</u>, <u>supra</u>.

### B. Due to Lack of Physical Evidence, Insufficient Showing Made that Rape Occurred

Petitioner claims that because there was no physical evidence to support a finding that the victim had been raped, but rather, such a finding was based solely upon the victim's unsubstantiated testimony, there was insufficient evidence reflecting that a rape occurred. Petitioner raised this same argument in his state post-conviction application.[17] Rather than addressing the merits of petitioner's claim, the state trial court determined that it had been raised on direct appeal and, pursuant to La.C.Cr.P. art. 930.4(A),[18] refused to consider the matter.[19]

---

[17]<u>See</u> State rec., vol. 4 of 5, pp. 1046-1043.

[18]La.C.Cr.P. art. 930.4(A) provides:  "Unless required in the interest of justice, any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered."

[19]The state trial court made this determination despite the fact that the argument presented in support of petitioner's insufficiency of evidence claim on direct appeal was completely different from the supporting argument set forth in his post-conviction application.  On direct appeal, petitioner argued that under the simple rape statute, LSA-R.S. 14:43, as amended in 1997, one must show: 1) that the victim was in a stupor; 2) that the stupor was caused by an intoxicating agent; and 3) that the intoxicating agent was administered **without the victim's knowledge**. Petitioner argued that the State had failed to make the requisite showing since "[t]here was absolutely no testimony in the record to indicate that an intoxicating agent was administered by anyone other than [the victim]."  <u>See</u> State rec., vol. 4 of 5, p. 877.

Generally, a federal habeas corpus petitioner is considered to have procedurally defaulted a claim, thereby barring federal review, in a situation such as this where the last state court to consider the claim,[20] rather than addressing the merits, relies upon a state procedural rule to dispose of the matter. See generally Bell v. Cain, 2002 WL 31002831, *4 (E.D. La. 2002). However, an exception to this general rule arises when the state procedural rule employed to dispose of the claim is La.C.Cr.P. art. 930.4(A). As explained in Bennett v. Whitley, 41 F.3d 1581, 1583 (5th Cir. 1994), Article 930.4(A) "is not a procedural bar in the traditional sense" and therefore, does not bar federal habeas corpus review. See also Bell, 2002 WL at *9 n.37, citing Bennett, supra ("A claim denied pursuant to La.C.Cr.P. art. 930.4(A) is not procedurally barred in a federal habeas corpus proceeding."). Accordingly, the court shall proceed to address the merits of petitioner's claim.

The appropriate standard for review of a claim of insufficiency of the evidence is "... whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The

---

[20]Neither the state appellate nor the state supreme courts issued reasons supporting their adverse decisions in connection with petitioner's post-conviction application.

Fifth Circuit has held that in making determinations on the sufficiency of the evidence, the court should not substitute its view of the evidence for that of the fact finder, but should consider all of the evidence in the light most favorable to the prosecution.  <u>Whitmore v. Maggio</u>, 742 F.2d 230, 231-32 (5th Cir. 1984).  The assessment of whether the commission of a crime is adequately supported by the record necessarily entails reference to the substantive elements of the criminal offense as defined by state law.  <u>Alexander v. McCotter</u>, 775 F.2d 595, 597-98 (5th Cir. 1985); <u>Turner v. McKaskle</u>, 721 F.2d 999, 1001 (5th Cir. 1983).

Under LSA-R.S. 14:41, rape is defined as "the act of anal, oral or vaginal sexual intercourse with a male or female person committed without the person's lawful consent."  The statute further specifies that "[e]mission is not necessary, ... any sexual penetration, when the rape involves vaginal or anal intercourse, however slight, is sufficient to complete the crime."

Petitioner argues that there was insufficient evidence to support his rape conviction because there was insufficient physical evidence to support a finding that the victim was raped.  In support of his argument, petitioner relies heavily upon the direct examination testimony of Dr. Randall Lillich, the physician who examined the victim shortly after the incident.

BY MR. BYRNE [DEFENSE COUNSEL]:

Q.  What do you look for in examining a rape victim?

13

A.   The main thing you look for is bruises, cuts, and tears and any sign of injury, or forced penetration basically.

Q.   Okay.  And you didn't observe any of that, did you?

A.   No, I did not.

Q.   And the same would be [true] for the rectal exam?

A.   That's correct.  There's also, on one of these other pages, Step 13, you know, where I ... wrote "vulva, introitus, vagina, cervix, uterus, and adnexa," they're all normal.  "Hymen normal (no longer present) and rectum and anus normal."

Q.   Well it wouldn't be unusual for a mother of three children –

A.   Right.

Q.   – to not have a hymen?

A.   Right. Right.

Q.   But everything else was normal?

A.   It was normal.

Q.   Did you observe anything that was abnormal?

A.   (The witness reviewed his report.)  Apparently not, other than the smell of alcohol on the breath.

Q.   Okay.  And did you note a diagnosis?

A.   I put alleged rape on there.[21]

The   implication,   based   upon   the   above-quoted   direct

---

[21] See State rec., vol. 3 of 5, pp. 498-497.  As with vol. 4 of the State rec., the pages in vol. 3 are Bates-stamped in inverse order.  Dr. Lillich's testimony to the effect that the victim suffered no bruising or abrasions was corroborated by Registered Nurse Amy Lea who assisted the victim in undressing prior to her examination by Dr. Lillich.  See State rec., vol. 3 of 5, pp. 509-508.

examination testimony of Dr. Lallich, that in the absence of physical evidence, no rape could have occurred, is dispelled by the following cross-examination testimony of Dr. Lallich.

CROSS-EXAMINATION BY MR. LAZARUS [prosecutor]:

Q. [H]ave you ever examined a rape victim who did not have bruising?

A. Yes, I did.

Q. [H]ave you ever examined a rape victim [whose] vaginal examination is essentially normal?

A. Oh, yes, I have.

Q. On how many occasions, ... percentage-wise?

A. I would say about 50 percent of the time.

Q. So it's your testimony that 50 percent of the time a rape could occur and you have a normal vaginal examination?

A. Yes.

Q. Your testimony today is not that Ms. Skains [the victim] was not raped; is that correct?

A. That's correct. I indicated on my diagnosis that it was an alleged rape.

Q. And that's not your decision to make.

A. That's right.

Q. Is that a fair statement?

A. Right.

Q. Is it also a fair statement that the lack of physical injuries to the vaginal area does not mean ... that there was no rape; is that correct?

15

A.   That's correct.[22]

Petitioner, in support of his insufficiency argument, also relies upon a form completed by Dr. Lallich which allegedly reflects that the victim informed, in connection with her rape, that "she wasn't real sure" if vaginal penetration had occurred.[23]

---

[22]See State rec., vol. 3 of 5, pp. 497-496.  Petitioner attempts to neutralize this damaging cross-examination testimony, asserting that the instant matter could not fall under the 50 percent of the cases where a rape takes place even though no physical evidence of the rape exists because "[i]n this case, the alleged rape victim reported being raped repeatedly 4 or 5 times within a forty-five minute period."  Petitioner opines that in such a situation, "[t]here would [be] some [physical] indication to verify rape."  See Federal rec., doc. #1, petitioner's memorandum in support of writ of habeas corpus at p. 15.

[23]See Federal rec., doc. #1, petitioner's memorandum in support of writ of habeas corpus at p. 15.  An examination of Dr. Lallich's trial testimony reflects the following colloquy:

CROSS-EXAMINATION BY MR. LAZARUS [the prosecutor]:

Q.   I'm a little confused on [questions] 11 and 12 ... [of the] Victim's Medical History....   There's a column that says was the -- was there penetration of the vagina, anus and mouth.

A.   That's correct.

Q.   And [the provided responses are] attempted, successful, ejaculation yes, no, unsure.  I take that to mean, Doctor, that there's a two-part question.  Was there penetration of the vagina, attempted, successful. You would put either one.

A.   Right.

Q.   And then the next question is ejaculation and therein there are three responses.  Ejaculation, yes, no, and unsure.  Is that how you should read that or is it a form that really makes no sense?

According to petitioner, the victim would "definitely have known if there was penetration if she had in fact been raped."[24]

The basis of the above argument is refuted by the unequivocal sworn testimony of the victim, Sherry Skains, who stated, on direct examination:

Q.  Where did they take you ....?

A.  They took me behind the mall....

Q.  Okay.  What happened when you got there?

A.  They both got out [of] the car and they both kind of walked to the front of the door of the house, and they looked like they were talking and then I rolled down the window a little bit and I told them I needed to go home. Because I started feeling nervous, because I never [saw] two guys get out [of] the car like that when I was in a cab.  And they turned around and they walked to the car and they grabbed me by the hair and my arm and they pulled me out [of] the car [and] into the house.[25]

Q.  Did they say anything to you between the time they pulled you from the car until the time you got to the doorway?

A.  They told me to shut up, fucking bitch, just shut –

---

A.   Well the form is a little bit confusing.  But my interpretation of this is that the patient probably told me that there was successful penetration of the vagina, let's say, but she wasn't real sure about that.

Q.  Okay.

A.  That's my interpretation on it.

See State rec., vol. 3 of 5, pp. 496-495.

[24]See Federal rec., doc. #1, petitioner's memorandum in support of writ of habeas corpus at p. 16.

[25]See State rec., vol. 3 of 5, p. 569, lines 18-30.

be quiet.  Because I kept saying please don't kill me.

Q.  Were you crying at that point?

A.  Yes, I was shaking.

Q.  And once you got into the house, did they tell you anything?

A.  They just told me to be quiet.

Q.  Did they threaten your life in anyway?

A.  At one point they did.

Q.  What did they tell you?

A.  They told me they would hurt me if I hollered again or if I tried to get away.

Q.  Did they bring you into any particular room?

A.  Yes, the room left of the hallway.  I mean right of the hallway.  Into a room with no furniture in it.[26]

Q.  Is that - now, they brought you into the room.  What did they tell you to do once you were in the room?

A.  I was shaking and they started taking off my clothes.

Q.  Did you -

A.  And I told them please don't kill me.  Don't kill me, let me live.  I have three kids to live for.

Q.  Did they tell you to take your clothes off?

A.  No, they were taking them off.  I was shaking and trembling.

Q.  Did they take all your clothes off?

A.  Yes, sir.

---

[26]See State rec., vol. 3 of 5, p. 568, lines 26-32; p. 567, lines 1-13.

Q.  When they took all of your clothes off, what happened
after?

A.  They pushed me on the floor and the younger one held
me down and the older one got on top and penetrated ...
me.[27]

Q.  Who was the one who held you down, Mr. Argo?

A.  Mr. Argo.

Q.  And what did Mr. Higginbotham do?

A.  He was on top of me.

Q.  **And did he penetrate you?**

A.  **Yes.**

Q.  Do you know whether or not he ejaculated?

A.  No, sir.  I was just worried about my life.[28]

Q.  What happened after Mr. Argo held you down and Mr.
Higginbotham –

A.  They switched, and Argo was on top of me....

Q.  And then Mr. Argo was on top of you?

A.  Yes, sir.

Q.  **Did he penetrate you?**

A.  **Yes.**

Q.  What happened after that, Sherry?

A.  They switched again....  **Higginbotham penetrated me
again.**

_____

[27]See State rec., vol. 3 of 5, p. 566, lines 2-19.

[28]See State rec., vol. 3 of 5, p. 566, lines 28-32; p. 565, lines
1-3 (emphasis added).

Q.   How long did this go on?

A.   They switched about four or five times.

Q.   And they did the same thing over and over?

A.   Yes, sir.

Q.   Over again.

A.   Yes.

Q.   Were they saying anything when this was happening?

A.   No.

Q.   What were you doing when this was happening?

A.   Please don't kill me.  Why y'all doing this to me. Y'all shouldn't be touching me.  You shouldn't have no right touching me like this.

Q.   Now, did you have a feeling that the only way you could get away was by having sex with them?

A.   Yes, sir.

Q.   Did you have any other option given to you?

A.   No.

Q.   And there were two people participating in what happened to you?

A.   Yes.

Q.   Did you consent to any of the sexual acts that were performed?

A.   Never.  No.

Q.   Did you want to go into that house?

A.   No, sir.[29]

_____

[29]See State rec., vol. 3 of 5, p. 565, lines 7-9, 15-22 and 24 (emphasis added); p. 564, lines 1-17.